**La Salle National Bank, Administrator of the Estate of Johnetta Spearman, Deceased, Plaintiff-Appellee, v. Jacob Feldman, et al., Defendants-Appellants.**

**Gen. No. 49,935.**

First District, Fourth Division.

December 28, 1966.

Meyer, Gorov, Feder & D'Amico and Orner & Wasserman, of Chicago (Norton Wasserman, of counsel), for appellants.

Overton, Marks & Schwartz, of Chicago (George W. Overton and Harry Golter, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

This is an appeal by defendants from a judgment for $15,000 in favor of plaintiff as Administrator of the Estate of Johnetta Spearman, Deceased, a child of less than two years of age, who was fatally injured in a fire which occurred in an apartment rented by defendants to Johnetta's parents. Plaintiff's theory of the case is that defendants were negligent in failing to provide and maintain an adequate electrical system in the building, thereby allowing the condition which caused the fire and resulting death. Defendants contend that plaintiff's evidence failed to prove any negligence on their part and that, consequently, the trial court's refusal to direct a verdict for defendants constituted reversible error.

We shall first consider the testimony of deceased's mother. In August, 1959, she rented a three-room first floor rear apartment in a building jointly owned by defendants. The building was three stories high and was divided into twelve apartments. On November 13, 1959, at about 9:00 p. m., Mrs. Spearman put her three children to bed, but they did not go to sleep right away. She then turned out all the lights in the apartment because she was going to visit with Mildred, a neighbor, and

she told this to Lorenzo, her three-year-old son. Mildred lived in a building located a short distance from the defendants' building, only a backyard separating the two buildings. A few minutes after Mrs. Spearman arrived at Mildred's apartment, she heard Lorenzo come up the stairs crying. As Mrs. Spearman stepped out of Mildred's apartment to take Lorenzo home, she smelled smoke and could see flames through her bedroom window across the yard. She immediately ran downstairs and across the yard to her own apartment. She found the deceased in the kitchen in a badly burned condition. She was able to assist her other child to safety. Deceased was taken to the County Hospital and died shortly thereafter.

There were no eyewitnesses to testify as to the origin of the fire. Plaintiff therefore called an expert witness to give his opinion as to the cause of the fire, and it is on his testimony that plaintiff's case must stand or fall. Florian Kaitis testified that he was a duly licensed architect; that his training and experience included a period of employment by the Department of Buildings in the City of Chicago; that his duties during such employment included making inspections of fires and hazardous buildings.

Kaitis then testified concerning the instant case. Three days after the occurrence, at the request of plaintiff, he visited the premises. His examination of the interior of Mrs. Spearman's apartment revealed that the fire had started somewhere in the bedroom. He observed that at about the center of the north wall of the bedroom a piece of armored cable was hanging down and apparently had been cut off recently, since it had not been subjected to the fire. In the basement of the building he observed that the fuse box was located in a space almost directly below the Spearman bedroom. The fuse box contained holders for twenty-eight separate fuses, and there was a legend on the door of the fuse box indicating which fuses served which apartments. Of the twenty-

eight fuse holders, or sockets, twenty-seven had fuses in them, while one was empty. He next located the fuse switch which the legend indicated served the Spearman apartment. The first fuse socket was empty, and the other held a fifteen-ampere fuse which he removed. Behind this fuse he found a penny with three burn marks on its back and a burn mark on its rim. Such burn marks are typically caused by the short-circuiting of a fuse holder at a time when there is severe overcurrent. At least fifty amperes of current would be necessary to cause such markings.

Continuing with Kaitis' testimony, he returned to the bedroom to look for any electrical wires that might be there. He found two such wires, one a telephone wire and the other a flexible lamp cord. The latter was composed of pieces of wire spliced together. It had been subjected to much heat and at one point of the cord some strands of wire were fused together. The general cause of such fusing is a short, which did, in fact, exist at the place of fusing of the subject wire. Kaitis then testified that the purpose of a fuse is to prevent the circuit or wire from overheating; that if something happens to cause overheating of the wire, the fuse is supposed to burn out and thus stop the current from flowing; that if a penny is placed behind a fuse, the fuse becomes useless, the current flows directly through the penny instead of the fuse, and the burning out of the fuse does not cut off the accelerated flow of current.

Kaitis was next asked whether a safer fuse box arrangement could have been used by defendants. He answered that a Type–S fuse is a safer fuse than the E–base fuse used by defendants, since it consists of an adapter which fits into the fuse holder, and once the adapter is installed it cannot be removed without damaging the fuse. Kaitis testified further that a penny could not have been inserted in an S–type fuse because it would accommodate only an object which could be manipulated

over the sides to make contact with the side clips to produce a short circuit. He said that S–type fuses were in general use in the City of Chicago on the date of the occurrence.

On cross-examination, Kaitis admitted that the penny could have been placed in the fuse box during the three days after the fire and before his examination; that as to the lamp cord, the only way he could tell the wire had been shorted was from the fusing of some of the wires, and that there would be nothing ordinarily present in the apartment that would cause sufficient heat for such fusing. Kaitis would not say that the short circuit in the cord definitely caused the fire, but, instead, conceded that the fire could have been caused by a child playing with matches. Indeed, he said, "I do not know what caused the fire." In addition, Kaitis admitted that he relied on the fuse-box legend and never actually checked to make sure that the fuse and the penny he examined were in the box that serviced the Spearman apartment.

The remainder of the material testimony was supplied by defendants' witnesses. Edward M. Crowe testified that he is a Captain in the Chicago Fire Department and Acting Battalion Chief; that he has been with the Fire Department for twenty-one years and was present at the fire in question, which was a fast-spreading fire with intense heat—definitely hot enough to burn the insulation off wire and melt the copper wire; that when he arrived, he found the bedroom to be the hot spot where the fire had started; that he thoroughly checked the electrical installations, the wiring of the building, lamps, lamp cords and plugs in the wall, and was unable to determine the cause of the fire. He was at the scene one hour and thirty-five minutes. On further examination, Crowe testified that the first thing he checks at a fire such as this is the fuse box; that the placing of a penny behind a fuse is a common cause of fires; that he immediately checked the fuse box in the basement

of defendants' building, and if he had found a defect of any kind, he would have put it down in his report; that he made no mention of a defect in the fuse box in his report which stated "undetermined cause." His conclusion was made in consultation with Chief Murphy who was also at the scene and had 40 years' experience in the Fire Department.

John W. DiTambell, an electrical contractor and licensed electrician, testified that in November of 1958 Mr. Feldman hired him to do some electrical work on the premises in question and, specifically, to remedy certain defects listed in a letter from the City Electrical Department. DiTambell stated that he did everything that was required by the letter; that he put fuses in the fuse box which was a kind in use in many buildings of that type in 1959.

Donald Coutts, an electrical inspector for the City of Chicago, testified that he inspected the premises in March of 1959 pursuant to a reinspection concerning the letter of violations which had been sent to the premises in October, 1958. He found that all the violations listed in the letter had been corrected. Coutta testified that he again inspected the premises within a week or two after the fire and found no violations with regard to the fuse box.

The errors assigned by defendants are as follows: (1) Defendants' motion for directed verdict should have been allowed; (2) the testimony of Florian Kaitis should not have been admitted since it was based solely on knowledge obtained through post-occurrence observation; and (3) portions of the closing argument by plaintiff's counsel were inflammatory and so prejudicial as to require a reversal.

■■ The primary question raised on this appeal is whether there is any competent evidence to support the allegation that defendants were negligent. If not, the trial court erred in overruling defendants' motion

369

for directed verdict. Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275. Such a motion presents the fundamental question of whether the record contains any evidence which, in itself, and, taken with all its intendments most favorable to the opposing party, tends to prove the essential elements of that party's case. Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847; Gorczynski v. Nugent, 402 Ill 147, 83 NE2d 495. We turn, then, to a comparison of plaintiff's allegations, with the evidence introduced.

The major part of plaintiff's case is predicated upon five separate conclusions expressed in the testimony of its expert witness, Florian Kaitis, who examined the premises three days after the fire. The first conclusion testified to by Kaitis is that of the existence of a short circuit in the lamp cord in the Spearman bedroom. It is obvious that the existence of a short circuit in the lamp cord, in and of itself, does not establish negligence on the part of defendants. The short circuit may have occurred before or after the fire. Moreover, there is no evidence in the record to explain how the lamp cord became a part of the electrical system of the Spearman apartment. For all that appears in the record, it is possible, if not probable, that Mrs. Spearman herself, rather than defendants, purchased or installed the lamp cord. Further, Kaitis would not say directly that a short circuit in the lamp cord had caused the fire in the Spearman apartment.

The second and third conclusions of plaintiff's expert were that such a short circuit as was evident in the bedroom lamp cord would have caused sufficient heat to produce the fusing of the wires; and that the heat from the fire which raged through the bedroom of the apartment would have been inadequate to cause the fusing of the wires. (This latter point was controverted by the testimony of Captain Crowe, as recited above.) Again,

however, it is clear that whether or not a short circuit in the lamp cord did, in fact, cause the fire is not, in itself, any evidence of defendants' negligence.

A fourth conclusion of Kaitis was that the burn marks which he found on the penny three days after the fire must have been caused while the penny was in back of a fuse at a time when there was a severe overcurrent. In an attempt to make this meaningful as evidence of negligence, he coupled it with a fifth conclusion that at the time of the fire there existed an inexpensive S–type fuse system which would be difficult or impossible to short-circuit. From this testimony, plaintiff contends that defendants are guilty of negligence in inadequately protecting the electrical system by virtue of their failure to install the allegedly safer S–type fuse to replace the E–base fuse. Neither the record nor common experience sustains plaintiff's contention that defendants' retention of the E–base fuse system at a time when the allegedly safer S–type fuse system was on the market is evidence of defendants' negligence. DiTambell testified that on the date of the fire it was common to use E–base fuses in buildings similar to defendants' and that E–base fuses were in common use in Chicago. Kaitis, himself, testified as follows: "I would say that in November of 1959 there were probably hundreds of thousands of those E–base fuses in the City of Chicago and that there are still being used hundreds of thousands of E–base fuses." He also conceded that in his opinion the S–type was only somewhat safer, since it also could be shorted out almost as easily as the E–type by use of a piece of ordinary aluminum foil, copper wire, a thin hairpin, etc.

■ ■ It would be contrary to the definition of negligence for us to hold that failure to abandon an electrical fuse system which is in extensive use throughout the City of Chicago constitutes a negligent omission. The fact that a relatively short time before the fire the Electrical

371

Inspection Division of the City of Chicago issued to defendants a letter of electrical violations without mention of the E–base fuse system further exposes the weakness of this proposition. And it will be recalled that the testimony of Coutts, the City electrical inspector, indicated that an inspection letter issued on November 20, 1959, a week after the fire, revealed no violations with regard to the fuse box on the premises. We simply cannot agree that retention of the E–base fuse system constitutes evidence of negligence. Nor do we find any evidence of negligence in Kaitis' testimony taken as a whole. Cases of interest in support of this finding are McCarty v. Metropolitan Life Ins. Co., 28 NYS2d 142, 143, and Tedrow v. Des Moines Housing Corp., 249 Iowa 766, 87 NW2d 463, 466–467 (1958).

■ ■ Because this case involves the unfortunate death of a very young child, we have considered the sufficiency of plaintiff's evidence and found it wanting, even when assessed in the light of the rule applicable to directed verdicts. We did so despite the fact that we also find that Kaitis' testimony (on which plaintiff's case necessarily rests) was inadmissible anyway. Testimony based on an inspection after the event in question is not competent unless evidence is also introduced to show that the conditions inspected had remained unchanged in the interim. Rotche v. Buick Motor Co., 358 Ill 507, 103 NE 529; Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 37, 139 NE2d 275. In the instant case there was not only no evidence to show that the premises, and especially the fuse box, had remained unchanged for the three days after the fire until inspection by Kaitis, but there was testimony from which a contrary conclusion is the only reasonable inference. Kaitis himself testified that an armored electrical cable in the apartment had obviously been severed sometime after the fire. He also said that one of the two fuses (in what he took for granted was the Spearman fuse box) was

missing. Yet Mrs. Spearman testified that all the lights were turned on in the apartment and the refrigerator was operating when she had turned off all the lights upon leaving to visit her neighbor. This, of course, could not have been fact, if one of the two fuses had then been absent. And, conversely, since her uncontradicted testimony established the fact that all lights and appliances were operating just before the fire, then the fuse box must have been tampered with after the fire and before Kaitis examined it three days later. There was also the Fire Captain's testimony that he had personally examined the fuse box at the time of the fire and reported no irregularity. The cases cited by plaintiff are distinguishable. Hutchinson v. Des Moines Housing Corp., 250 Iowa 1306, 99 NW2d 81, 89 (1959); McManus v. Pennsylvania Elec. Co., 389 Pa 168, 132 A2d (1957); and Fitzpatrick v. Public Service Co., 101 NH 35, 131 A2d 634 (1957).

■ Even if Mrs. Spearman's positive and undisputed testimony were to be ignored (which cannot properly be done), and we were to consider only Kaitis' testimony as to the condition of the fuse box, plaintiff's position would not be improved, because the presumption of continuance of a condition runs forward but ordinarily does not reach backward in time. The nature of the claimed defect and the surrounding circumstances in the instant case are consistent with the reason for this general rule rather than its exception. Schwartz v. Peoples Gas Light & Coke Co., 35 Ill App2d 25, 32–33, 181 NE2d 826; Shipley v. Southern Pacific Co., 44 Ill App2d 1, 7–9, 193 NE2d 862; Redmond v. Huppertz, 71 Ill App2d 254, 257–258; Jines v. Greyhound Corp., 33 Ill2d 83, 87–88, 210 NE2d 562. See, also, the concurring opinion in Stankowitz v. Goldblatt Bros., Inc., 43 Ill App2d 173, 182, 193 NE2d 97, and cases there cited. Again, the cases cited by plaintiff are distinguishable on the facts. Grand Trunk Western R. Co. v. M. S. Kaplan Co., 43 Ill App2d

373

230, 238–239, 193 NE2d 456; Gass v. Carducci, 37 Ill App2d 181, 189–190, 185 NE2d 285.

We conclude, therefore, that defendants' objection to the competency of Kaitis' testimony under the circumstances should have been sustained.

Finally, we shall consider briefly plaintiff's last contention of defendants' negligence, raised for the first time on appeal, that the Chicago Building Code has been violated by defendants' arrangement of their electrical fuse system. The ordinance provides:

> Overcurrent devices shall be enclosed in cutout boxes or cabinets, unless a part of a specially approved assembly (as in fluorescent fixtures, Section 87–410.27) which affords equivalent protection, or unless mounted on switchboards, panelboards or controllers located in rooms free from easily ignitible material and dampness. Such locations to be accessible only to qualified persons. The operating handle of a circuit-breaker may be accessible without opening a door or cover. Municipal Code of Chicago, Sec 87–240.36.

■ It is not argued that defendants did not provide a suitable fuse box or cabinet, but only that they did not, somehow or other, limit its access to "qualified persons." The ordinance does not designate who are to be considered as qualified persons, but common experience tells us that this category must include an apartment building's tenants. For a landlord to lock out his tenants from access to the fuse box (except where there is a janitor in constant attendance) would be contrary to good sense and contrary to the custom of locating the fuse box in a place readily accessible to tenants in case of a blown fuse. We cannot believe that the ordinance quoted above has rendered unlawful such a well-established practice. In the instant case there is no evidence

374

that would tend to prove that the fuse box location was negligently made accessible to strangers or to anyone other than tenants, of which there were at least twelve. We are unable to say that the ordinance in question affords any support for plaintiff's judgment.

Since it is our decision that the judgment must be reversed for failure of the trial judge to direct a verdict for defendants, we will not discuss defendants' third assignment of error alleging inflammatory and prejudicial argument by plaintiff's counsel. The judgment of the Circuit Court is reversed with judgment here in favor of defendants.

Reversed with judgment here.

DRUCKER, P. J. and McCORMICK, J., concur.